May it please the Court, good morning, Your Honors. My name is Ed Zabkowski and I'm representing Petitioner Jose Luis Barrios-Gonzalez. The trial attorney, Mr. Gayhart, is here with me. I'd like to reserve three minutes for rebuttal, then Mr. Gayhart will handle the rebuttal and I'll handle the initial argument. Also with me today is our client, Jose Luis Barrios. I'd like to start, if I may, to talk briefly about a lot of things that are clearly in agreement now or weren't necessarily when the case was first filed. One, the witnesses, the three witnesses that testified, the two parents and Jose Luis, were found to be credible by the immigration judge. Two, there's no dispute that Jose is a member of a social group through which asylum can be granted, namely homosexuals in the country of Guatemala. Three, there's no dispute that the immigration judge points out in his brief that the parents of Mr. Barrios suffered and were found to have suffered, I should say, derivative asylum by the brutal beating that his father suffered when they could not find Jose at the family house and have since been granted asylum in the country of Canada, and also they are now Canadian citizens. As a result, based upon the immigration judge's decision in this case, I suggest to you, Your Honors, that we have a result that borders on the absurd. A result in which the derivative victims of asylum, the father, the parents, and the brother of Jose Luis, are safe and have been granted asylum in the country of Canada, but the target of this asylum, this conduct, this egregious conduct, has not been granted asylum in this particular petition in the United States of America. Could he have obtained asylum in Canada? I don't, perhaps he could, yes, but he applied in the United States of America, and I believe he, well, I'm not sure if he applied before or after his parents did. I think he applied before his parents did. I know that he left and came to the United States before his parents left and then went on to Canada. I also believe that there is a finding by the immigration judge that the conduct that Mr. Barrios' family suffered rises to the level of conduct that's so egregious that it would justify a finding of persecution. So what the primary basis is for the denial of asylum for Mr. Barrios is that because Mr. Barrios believed that the gentlemen at issue, that were the persecutors, were not government actors, therefore Mr. Barrios had to establish that they were individuals that the government was unwilling or unable to control. The father, who was the subject of the persecution by the exact same four individuals, believed that they were, and was convinced that they were, in fact, government actors, did not report anything because it would be futile to do so to the government if they were, in fact, government actors. The immigration judge explains away and excuses the father not having to report it, but does not excuse it. What basis did the father have for believing they were government actors? He made the comment about the boots. He said that, I think it was mentioned by the immigration judge in the transcript, that the wife believed that because they were dressed like farmers when they went there that night, that they were farmers. He asked the same question of Mr. Barrios and he said no, they weren't. I can tell you because of the boots. Farmers don't wear military-issued boots the way those gentlemen did. My point is simply this. They either are or are not government actors. The immigration judge applied this absurd test in which whether or not these people were immigration actors was not a matter of fact in reality, but rather the impression that they conveyed upon their victim. And because Jose, a 14 or 15-year-old at the time, was not as knowledgeable as to what government actors would look like as his father was, he didn't think they were. Nor did the mother. Nor did the mother, the housewife. She thought that they were farmers because they looked like farmers. So my point is simply the immigration judge never made the determination whether they were or weren't except for to acknowledge that the father felt that they were and the father was there for excuse for not reporting it. The other point to remember here is that when they went to the Barrios family house, they were not there to get and to beat up the father. They were looking for Jose Luis. So if they are in fact government actors, they're government actors looking for their intended victim, the direct victim, Mr. Barrios. Not for the father. The father suffered a derivative of beating as a result. If in order to have consistency here, they either have to be or not be government actors. If they're not government actors, the mother testified, and I believe Jose testified, that they were either rebels or outlaws. And the immigration judge says, well, then you should report it to the police. A couple things that are missing here from that analysis. One, Guatemala was in the midst of a 30-year civil war at the time. It is unclear to those people living in the small communities exactly who is on which side at which time. Whether these people were in fact part of the military or part of the rebels was uncertain. They tried to avoid these people. Two. These people meaning whom? The rebels. Or people that may be rebels or dressed in military, whatever they were. The band of outlaws I think the mother alluded to. Two. By definition, if they are in fact outlaws, then by definition, they are individuals that the government is unable to control because they live outside the law. That is, accepting your premises, yes, that is what an outlaw means. But whether the label is appropriate here is the subject of some discussion because your client and his parents did not report any of this to the police. We have no way of knowing whether the Guatemalan authorities would have taken any appropriate action in this case. But we do know this. We have at the time, concurrently at the time, some individuals who I would use and suggest to the court to apply as sort of the reasonably prudent person test. Individuals who were in Guatemala contemporaneously, knew the situation, and were professionals. In a situation with the father, the doctor at the hospital, the mother pleaded, don't tell the police, I'm afraid they'll come back and get back at us. The doctor, the educated professional over there, who has to be also not only responsible for Jose's father, but also for the safety of everyone else in the hospital, made the determination that yes, what is best done here is not to report the incident to the police. And it was not reported as a result. That was a judgment independent of Barrio's family, but made by a professional individual there who was faced with the very same problem and predicament that we would be if we were there at the time. Is there any evidence that the police would not have responded? Either because of the particular circumstances or because of their attitude towards gay men? Yes. There is evidence in general that we have submitted in the record with respect to country conditions about the treatment of cases in which a homosexual has been murdered. We point out, and I can give you the citation, that really of all the homosexuals that were murdered because they were homosexual, only one, who happened to have been an American citizen, the issue was investigated. This is not a particular crime that the perception is in Guatemala, is worthy of significant time and investment in investigating a murder of such an individual. Now, of course, we don't have a murder here because at the end of the day, Mr. Barrio's made the wise decision to follow the advice of the other independent educated person there, the teacher. The teacher, when told about what happened in the school bus that was coming into town and the beating of Jose and the threat that if he ever saw him again, he would shoot him through a bullet through his head, the teacher didn't say go to the police and report it. He said, son, get out of this country. What was the fate of the teacher? I'm sorry? The fate of the teacher. I mean, he seemed to be public and vulnerable, and yet there's no evidence of anything of the kind of mistreatment described of your client's father happening to him. Not on the record. That's correct. But I'm not sure of the relevance of that because it's not on the record. Well, what was supposed to have, in effect, disclosed your client's social identity that put him at risk had to do with the teacher. And if the teacher's there and nothing's happening to the teacher, it does begin to raise questions as to how vulnerable your client was because of being identified with the teacher. I mean, the teacher should have been the prime target and nothing happened to him. Maybe yes, maybe no. We do know that they tried to basically kidnap Jose and rape him. We do know that they went to – I think that there's no dispute here that the conduct was designed to – excuse me. The conduct was designed specifically to go at Jose Luis. I guess we don't know one way or the other whether or not anything was ever done to the teacher, but what we do know is that given the fact pattern there at issue, the teacher's advice to somebody he cared for was not to go to the authorities. It was to go to leave the country. I see my time is, I believe, close to up, so if I could reserve the rest for Mr. Gayhart and Barbara Bell. We'll hear from the counsel for the Attorney General. Good morning, Your Honors. Jessica Siegel for our Respondent, Eric Holder. In this case, it is important to remember that asylum has three requirements to establish eligibility for that relief. One is that the harm rises to the level of persecution. Two is that it is on account of a protected ground. And three, what this Court has discussed this morning is that the government must be unable or unwilling to control the actors if they are non-state actors. It is clear in this record that nobody knows who the actors were in this case. Even the father's testimony on page 96 of the record demonstrates that he wasn't even sure who these individuals were. Mr. Barrios didn't know who they were. The teacher didn't know who they were. And for that reason alone, there's no evidence that the government is unable or unwilling to control these individuals. They simply had no idea who they were. What was the finding of the IJ with regard to past persecution? The immigration judge determined that the harm that Mr. Barrios suffered coupled with the harm that his father suffered on account of Mr. Barrios' sexual preference, it did constitute persecution. And that's on page 11 of the immigration judge's decision. Well, if there was past persecution, then the formula changes for how you evaluate well-founded fear. Was there a finding of past persecution? Yes and no, Your Honor. And that's sort of the problem. No, because if the past persecution finding, in order to invoke the presumption, you must find both that the harm, all three, that the harm rises to the level of persecution, that it was on account of a protected ground, and that the government was unable or unwilling. You can't have the presumption without establishing all three of those requirements. And one negative finding as to those three is dispositive to all. And so it's irrelevant to this case, unfortunately, that the harm that Mr. Barrios suffered did constitute persecution in the agency's eyes. So where do I find in the IJ's decision his specific finding that this was something that the government was not unable or unwilling to control? It's on page 56 of the record, I believe. Let me just double-check that citation, but it's on page 56 of the record. Yes. I'm looking at page 56, and I can understand where that inference may be drawn, but I have trouble finding exactly where he makes a finding and points to evidence to support it. He makes the observation that the Ninth Circuit has observed that the government's not required to control or eliminate nongovernmental persecution. They don't make reasonable efforts to do so. But I don't find anything in here that talks about what efforts the government have made and the basis for a finding that, in fact, the government is either willing or able to control the circumstances. My answer to that question is twofold, Your Honor. First, as the board determined, and although we discussed the immigration judge's decision in this case because the board did affirm under matter of bravado, the board did clarify that it was particularly upholding this decision based on the government's failure to show that the government was unwilling or unable to control. And I believe that that's page 58. And what's the basis? Let's assume for the moment, and I had to draw that from the IJ's decision because I can't make sense of that otherwise, because he plainly doesn't shift the burden to the government with regard to changing circumstances and well-founded fear, which is something I think the BIA's decision could be faulted for as well, because it doesn't talk about that at all. It just recites there's not a well-founded fear. So that's why I go back to past persecution. And if the piece that's missing is the government's willing or able, what evidence is marshaled by the IJ to support a conclusion that the government is willing and able to suppress the violence or respond to the threats? Again, I'll discuss that. If there's anything in the IJ's opinion that marshals that evidence, I'd love to find it because I haven't. Sure. I'll discuss that both in the context of the facts of this case and the standards that this court has considered in making similar findings. For example, in Castro Perez, this court determined that a woman's failure to report a rape by her boyfriend to the police did not establish that the government was unwilling or unable to control, because her only excuse for not reporting that incident was she was afraid that the police wouldn't do anything or that her father would look poorly upon her because she was raped by her boyfriend. In here, we have the father, for whatever reason, believing, well, we know for what reason, he identified the boots, believing that in fact it was the authorities that were the source of the problem, which would seem to explain why it is you wouldn't want to go to the authorities and say we've got a problem. Is there anything that the IJ expresses that responds to that concern? Basically, I look at the IJ opinion, and I don't see where he, I can infer this finding. I don't see any place where he says, and this is the reason for it, or this is the evidence in support of it. So the question I wind up having to ask is, what is the substantial evidence in support of the finding that the government was willing and able to control the circumstances? The record does not compel reversal in this case because the background documentation and country evidence in this record discusses a general level of discrimination and harassment against homosexuals in Guatemala. It does not, however, discuss that the Guatemalan authorities refuse or are unable or unwilling to. The testimony that we have, not found in credible by the IJ, is the father believed that the people responsible for the violence were themselves part of the government or part of the Army because of the military boots. Now, that would be a thin reed, but it's something. And what is there that counters that, that gives reason to say, well, the family really should have gone to the police because they didn't have good reason to think that the people doing the beating were themselves part of the authorities? Well, first of all, the father did not specifically testify that these individuals were government officials. On page 96, he discusses that he didn't know who they were, that it was their hats and their dress and their boots that made them think that they were attempting to dress as farm workers, but he thought because they had guns they might be militia. That's clearly not enough for this Court to overrule. That does not compel the conclusion that the immigration judge's decision was erroneous in finding. And the conclusion was based on what? The conclusion was based on the fact that these individuals did not report the incidents. And just as in Castro Perez and in Ornelas Chavez and in Solando, all decisions by this Court, the failure to elicit the government's protective abilities is dispositive. Well, isn't there some evidence in the 203 country report in the record that suggests that the government is frequently unable to enforce these provisions, protection of individuals, due to inadequate resources, corruption, and a dysfunctional judicial system? During the year, there were at least five killings of male homosexual workers. There were no arrests made in any of the killings. The police who arrived on the scene abused the victims' companions. There were no arrests in the 2,000 killings of the five male homosexual sex workers. Now, this occurred some years after the incident. But you would think that, if anything, things might have been getting better than worse. Yes, that is reported in the country conditions report. But what is important for this Court to consider is individuals that are similarly situated to the petitioner in this case. And there is evidence in the record that petitioner is not a transsexual sex worker, which is what the 2003 country report was documenting. And even in this Court's decision in Solando, as well as in the First Circuit's decision in Galicia, and I have that citation if Your Honors are interested, the individuals who are similarly situated to Mr. Barrios may experience discrimination in Guatemala and may experience harassment in Guatemala. But under this Court's case law, those events clearly do not rise to the level of persecution, and thus there is no well-founded fear. And getting back to Your Honors' questions, it is muddled in the immigration judge's decision that the finding that there is no future persecution is related to the finding that the government is not willing or unable to control these individuals. Because that analysis goes together. Because there is no evidence in this record that the individuals are known as to who they were and that the government was given the opportunity to protect Mr. Barrios or his family, one must consider how that affects his objective fear of future persecution. Now, it's an objective standard both in determining whether or not the government is unable and unwilling to protect an individual, and it is also objective in this case, because this objective fear is not a question. This is from the 209 country report, which is not part of the record, but it's a document of which we could take judicial notice. And it says, Police threaten persons engaged in prostitution and other commercial sexual activities with false drug charges to extort money or sexual favors and harass lesbians and gay persons and transvestites with similar threats. Is this support for the proposition that it would have really been pointless to seek the help of the government? I see that my time is up. Go ahead. Thank you. We're taking you there. As a first note, we would argue that because it's not a part of the record and because it was not a part of the record before the agency when it decided this case, it is irrelevant to this Court's determination as to whether or not the standard was met in this case. But in considering that document in terms of if this Court were to take judicial notice of it, it would not establish that the record compels reversal, because not only must you show a systemic risk of persecution, but you must show an individualized risk as well for any disabled person. Here's where it gets complicated, because if in fact there should have been a finding of past persecution or we conclude that the IJ didn't clearly enough deal with that issue, things change when you deal with well-founded fear because of the shifting in burden. I take it you don't contest the proposition that the standard applied by the IJ and apparently by the BIA did not reflect a shift in burden. And so we have to really say, is the decision made with regard to well-founded fear, even if potentially supported or even if the evidence doesn't compel, can that be sustained if in fact the burden was shifted and the IJ and the BIA didn't respond to or deal with the shift in burden? The burden was not shifted in this case because the agency's findings were that the past persecution analysis was not met because the government was not unwilling or unable to control these individuals. Thank you. Officially you've got about six seconds, but we'll give you a full minute. Thank you. Please, the Court. I believe that the issue that's bothering the Court the most is, what does the record compel on whether the government's unwilling or unable to control? And under Exhibit 6, which starts at page 272 of the record, there's very, very strong evidence that the government is both unwilling and unable to control homosexual persecution. And probably the best evidence starts at 292, which is the Larry Lee case. He was murdered. The U.S. government is asking its friend, its ally in a country to whom it loans billions of dollars over the years to help out in sorting out his murder. Once it was discovered, though, going from 292 to 293 in the record, that it was because of Mr. Lee's homosexual relationships, the government just dropped the case. That simple. Government is just not willing to pursue these cases. We go on to the Andrew Redding article. That's Exhibit 6, my attachment 5, starts at 299. That article is also- Counsel, in this country we have an unfortunate history of gays and lesbians who have also been persecuted on account of their homosexuality, and yet we wouldn't conclude that all gay Americans were entitled to asylum someplace else because the government has been unable or unwilling to address those problems. The fact that we have one case in Guatemala that's unfortunate and that was dropped for some reason we don't know, it doesn't necessarily prove that the entire country is unwilling or unable to protect its gay citizens. There is some evidence in the record, in fact, that gays and lesbians in Guatemala City have an enclave in which they can congregate and in which the police are willing to offer them some measure of protection. Yes, but even as that Andrew Redding article and others in the record indicate, the proprietor of the bar that catered to them had to pay the police to keep the bar open, and he had to go to extraordinary lengths in order to protect himself, his business, and his customers by basically giving in to extortion by the police. And as you go through the record, page after page after page, there is, and again, as Mr. Redding's article here indicates, there is a pervasive dislike of gays in Guatemalan society, and he even compares it to other countries in Central and South America, that it is particularly bad in Guatemala. And as you go through Exhibit 2, which has... Since you're two minutes over, I wouldn't suggest diving into a new piece of evidence. But that too, as there are hundreds of pages of evidence there, both in the newspaper articles, Internet articles, and all kinds of reports about what was going on in Guatemala in the 1990s and how the government was not willing to try to solve or protect this disfavored minority. And I think if the court wants to look at its own precedent in Boyer-Sedano, where the court held that the alien had convincingly established... I think we know your point, and you're well over time. So we appreciate both counsel for the well-argued and helpful presentations. The case just argued is submitted. And we'll proceed to the next case on the argument calendar, Julio Martinez v. Holder.
judges: Korman, Clifton, Bybee